1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  UNIVERSAL PARAGON CORPORATION ET          No. C05-03100 MJJ

12  AL,                                        **ORDER RE DEFENDANTS' MOTION
                                               FOR SUMMARY JUDGMENT, AND
13              Plaintiff,                      COUNTER-DEFENDANT UNION
                                               PACIFIC RAILROAD'S COUNTER-
14      v.                                     MOTION FOR SUMMARY JUDGMENT**

15  INGERSOLL-RAND COMPANY ET AL,

16              Defendant.
    _____/

17

18                              **INTRODUCTION**

19          Before the Court is Defendants/Counter-Claimants Ingersoll-Rand Company Limited ("I-R

20  Bermuda"), Ingersoll Rand Corporation ("I-R New Jersey"), Schlage Lock Company ("Schlage"),

21  and Touch-Plate International, Inc.'s ("Touch Plate") Motion for Summary Judgment.  (Doc. No.

22  91.)  Therein, Defendants move for summary judgment on Plaintiffs' claims, and move for summary

23  judgment as to their counter-claim against Plaintiffs and Union Pacific Railroad Company under the

24  Hazardous Substances Account Act ("HSAA").  Plaintiffs Universal Paragon Corporation and

25  Sunquest Properties, Inc., and Counter-Defendant Union Pacific Railroad Company ("Union

26  Pacific") oppose the Motion.

27          Also before the Court is Counter-Defendant Union Pacific Railroad Company's Motion for

28  Summary Judgment.  (Doc. No. 100.)  Defendants/Counter-Claimants oppose the motion.

            For the following reasons, the Court **GRANTS** in part and **DENIES** in part Defendants'

**United States District Court**
For the Northern District of California

1    Motion for Summary Judgment, and **DENIES** Union Pacific's Motion for Summary Judgment.

2                                **FACTUAL BACKGROUND**

3            Unless otherwise specified, the Court finds that the following facts are undisputed.

4            Universal Paragon Corporation was formerly known as Tuntex (U.S.A.), Inc.  Sunquest

5    Properties, Inc. was formerly known as Tuntex Properties, Inc.  Union Pacific merged with Southern

6    Pacific Railroad ("SPR") and is the successor in interest to SPR.  SPR owned and operated the

7    Bayshore Railyard, which is bounded by Bayshore Boulevard on the west, Sunnydale Avenue on the

8    north, Industrial Avene on the southwest, and Tunnel Avenue on the east.

9            Defendant Schlage owns and formerly conducted operations on the real property located at

10   2401 Bayshore Boulevard, which is generally to the north and west of the Bayshore Railyard.

11   Schlage also formerly owned and conducted operations on the real property located at 2555

12   Bayshore Boulevard, which is to the north of the Bayshore Railyard.  Plant 3 is located at 2555

13   Bayshore Boulevard.  Since 1995, Touch-Plate has owned the real property located at 2555

14   Bayshore Boulevard.  Schlage and Touch-Plate are fully owned subsidiaries of I-R New Jersey.  I-R

15   New Jersey acquired Schlage in 1974.  I-R New Jersey is a fully owned subsidiary of I-R Bermuda.

16   I-R Bermuda was created on August 1, 2001.  I-R New Jersey's Vice President and Secretary

17   submitted a declaration wherein she states that neither I-R New Jersey or I-R Bermuda owned or

18   operated any property in the vicinity of the Bayshore Railyard.

19           SPR conducted railcar rehabilitation and steam locomotive maintenance operations at the

20   Bayshore Railyard from about 1941 to 1960.  SPR installed and operated sumps and two oil-water

21   separators in the northwest area of the Bayshore Railyard.  The wastewater from the sumps drained

22   to the Sunnydale sewer, which runs west to east under Sunnydale Avenue and along the northern

23   boundary of the Railyard.  Schlage admits that it conducted degreasing operations at Plant 3 and

24   used chlorinated solvents and volatile organic compounds ("VOCs"), including trichlororethene

25   ("TCE") and perchloroethene ("PCE") in that process.  Schlage's former degreasing and strip rooms

26   are adjacent to each other in the northeast corner of Plant 3.  Schlage used Plant 3 from 1950 to

27   1977.  Beginning on January 1, 1981, SPR leased to Schlage a parcel of property, Assessor's Parcel

28   No. 5101-006, to be used by Schlage as a parking lot.  The lease had a term of ten years.

**United States District Court**
For the Northern District of California

2

United States District Court
For the Northern District of California

1    The area of contamination in the northwest corner of the Bayshore Railyard is at the corner

2    of Sunnydale Avenue and Bayshore Avenue.  This area is adjacent to the property formerly owned

3    by Schlage and now owned by Touch-Plate.  The Bayshore Railyard first became subject to a clean

4    up order issued by the Department of Health Services, the predecessor to the Department of Toxic

5    Substances Control ("DTSC") in December 1988.  The regulatory agency concluded that the

6    Bayshore Railway was contaminated with VOCs, metals, and petroleum hydrocarbons.  A report

7    dated December 1989 prepared for Tuntex by AGS, states that:

8            [h]igh concentrations . . . of chlorinated hydrocarbon solvents have
             been found in the shallow ground water zone in the northwest corner
9            of the railyard.  The location and shape of the contaminant plume
             suggest an off-site source.

10

11    On December 28, 1989, Tuntex acquired the Bayshore Railyard from SPR.  The sale contract

12    specifies that the property would need remedial environmental work because "[t]he Property is and

13    has been used as a solid waste landfill site."  The sale contract also states that Plaintiff had full

14    access to the seller SPR's environmental reports.  Assessor's Parcel No. 5101-006 was part of the

15    property SPR conveyed to Plaintiffs.

16    In an Imminent and/or Substantial Endangerment Order ("ISEO") issued in February 1990,

17    the DTSC required SPR and Tuntex to investigate sources of contamination found on the Bayshore

18    Railyard.  This Order contains a statement that each Respondent listed in Section 1.1 of the Order,

19    including SPR and Tuntex, is a responsible party or liable person as defined by Health & Safety

20    Code §§ 25323.5 and 25385.1(g).

21    On April 10, 1991, Levine-Fricke wrote to Tuntex proposing a soil-gas survey since it was

22    possible that VOCs detected on the Bayshore Railyard were from off-site sources.  The letter further

23    states:

24            Soil gas surveying is an efficient and cost effective method of
             assessing whether shallow soils and ground water are affected by
25            VOCs and whether there are possible VOC source areas.  If the results
             of the survey indicate the likelihood of off-site sources, the
26            Department of Health Services may request that the Companies
             responsible participate in clean-up efforts.

27

28    In July 1991, Jim Rios joined Tuntex's as its Environmental Project Manager.  A letter written on

3

September 18, 1991 from Bechtel to Mr. Rios states that Bechtel was "highly suspicious that VOCs sources may occur in soil" on Defendants' property, and advised Tuntex to allow Bechtel to conduct a soil gas survey on the northwest side of the Bayshore Railyard.  Mr. Rios testified that within the first year of his employment, he too came to suspect that an off-site source for the contamination, and therefore, Tuntex contacted the DTSC and requested that the agency follow-up.

In June 1991, the DTSC notified Schlage that an ongoing investigation by Plaintiffs of the Bayshore Railyard  had revealed that groundwater downgradient from Schlage was contaminated with organic solvents and heavy metals.  The DTSC requested detailed information regarding Schlage's operations and its use of any chlorinated VOCs that had been detected in the groundwater on the Bayshore Railyard.  On April 6, 1992, after concluding an investigation, the DTSC wrote: "Based on the information received from the Pacific Lithograph Company and the Schlage Lock Company, DTSC could find no correlation between chemical use and disposal practices upgradient of the Bayshore Railyard, and the groundwater contamination pattern at the Railyard."

The north area of the Bayshore Railway contained sludge traps that were operated by SPR, and in a Negative Declaration dated October 1992, the DTSC wrote, "soil contamination by oil and VOCs was discovered in the extreme northwest corner of the North Area.  This area was the former location of two oil-water separators, which is [sic] the probable source of these hydrocarbons."

On November 8, 1993, EMCON Associates visually inspected and tested a sump in the northeast corner of  Plant 3 on Defendants' property was and determined that, "[a]t a minimum, a soil contamination 'hot spot' appears to exist in the sump area.  Plaintiffs contend they discovered that Defendants' property was the source of the soil and groundwater contamination in the northwest corner of the Bayshore Railyard as a result of this study.  On March 8, 1994, Schlage and Tuntex entered into a tolling agreement, tolling the statute of limitations periods as to any claims stemming from the contamination of their respective properties.  On September 9, 1994, the DTSC issued an ISEO to Schlage, I-R New Jersey, and Pacific Lithograph Co. concerning, *inter alia*, VOC soil and water contamination around Plant 3.

In 1995, Treadwell & Rollo, Defendants' consultants, continued to investigate contamination on the Schlage property by conducting historical research regarding the use of the Schlage property,

and all adjacent properties, and conducting a site exploration of the Schlage property and Bayshore Railyard.  Treadwell & Rollo concluded that groundwater flowed away from the Schlage property and parking lot towards the Railyard.  Also in 1995, the DTSC amended its 1994 ISEO to add SPR as a responsible party, but did not amend the site description to include Assessor's Parcel No. 5101-006.

On December 27, 1996, Tuntex filed suit in the United States District Court for the Northern District of California, Case No. C 96-4640 against Schlage, Touch-Plate, and Ingersoll-Rand Company.

A 1998 "Field Investigation Report, Schlage/Tuntex Sites" by Treadwell & Rollo again documented the belief that groundwater from beneath the Schlage property and parking lot flowed towards the Bayshore Railway.

Approximately three years into the 1996 litigation, Tuntex, Schlage, Ingersoll-Rand Co., and Touch-Plate entered into a Tolling and Cooperation Agreement (the "Tolling Agreement") that became effective on March 29, 2000, and Tuntex dismissed its claims without prejudice. The Tolling Agreement tolled all limitations periods under state and federal law, with respect to all actual or alleged claims in the action, for the tolling period, which commenced December 26, 1996 and expired on July 1, 2001.   In addition, the Tolling Agreement provided that the parties would: (1) cooperate to identify and obtain regulatory approval to manage contamination beneath the properties; (2) mediate the claims within 102 days after completion of a new groundwater management plan; (3) give each other mutual access to the respective properties; (4) establish a trust account to pay costs of shared consultants.  The Tolling Agreement also stated modifications needed to be in a writing signed by all parties.

Throughout 2000 and 2001 the parties submitted several versions of joint draft Risk Assessments ("RA"), and Remedial Investigation Reports ("RI") to the DTSC.  From 1999 to 2005, the parties continued work together to obtain approval by the DTSC of a Joint Groundwater Remedial Action Plan ("RAP").  Plaintiffs' former counsel, Mr. Goldberry, testified that while the parties sought regulatory approval, Defendants' counsel assured him that there was no reason to recommence the litigation in light of regulatory delays.  On March 1, 2002, Defendants' counsel

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   confirmed in an email that the Agreement "was still in effect (including without limitation, the

2   tolling of the statute of limitation) and we have been operating under that assumption." The email

3   also stated: "It probably is a good idea if we formally amend the agreement to extend it."

4        Also, in late 2000 and continuing into 2001, Plaintiffs' and Defendants' consultants

5   conduced a shut down test of the Ground Water Extraction and Treatment System previously

6   installed by Plaintiffs in the Bayshore Railyard.[1]  Late-2002 test results suggested that groundwater

7   from beneath some northern portions of the Bayshore Railyard flowed in the direction of the Schlage

8   property, and in 2003 Treadwell & Rollo began investigating the possibility that chlorinated solvent

9   contamination was migrating from the Bayshore Railway to the Schlage property.

10       In 2004, Mr. Goldsberry sought to commence mediation proceedings pursuant to the Tolling

11  Agreement, but Defendants asked Plaintiffs to hold off on mediation because Defendants were

12  trying to sell their property to Pulte Homes.   Through 2005, both Plaintiffs and Defendants

13  continued to pay funds into the reimbursement account created pursuant to the Tolling Agreement.

14  The Agreement was never extended in writing by the parties.

15       Plaintiffs filed this action was filed on July 29, 2005.  Defendants filed their Counterclaim

16  against Plaintiffs and Union Pacific on December 12, 2005.[2]

17                              **LEGAL STANDARD**

18       Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is

19  no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

20  law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the

21  initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings,

22

23       [1]A November 2000 letter co-signed by Treadwell & Rollo states tests revealed that in the absence of pumping by
     the Groundwater Extraction and Treatment System, the Sunnydale Sewer is downgradient of both the Schlage and Railyard
     properties.  In a November 2000 meeting, defense counsel informed the DTSC that pump shutdown tests had shown that
24   groundwater from both the Schlage and Bayshore Railyard properties flowed into a trough created by the sewer.

25       [2]Defendants only seek damages or contribution from Union Pacific for the alleged migration of hazardous substances
     onto the Schlage property from the Bayshore Railyard.  Defendants also do not seek damages from Union Pacific under their
26   common law theories for response costs Defendants' jointly incurred with Plaintiffs investigating solvent contamination in
     the north area of the Bayshore Railyard except to the extent those costs addressed contamination that allegedly migrated
27   onto or otherwise damaged property owned or possessed by Schlage or Touch-Plate.  Finally, Defendants seek damages under
     their common law claims for chlorinated solvent contamination found in Assessor's Parcel No. 5101-006 and for any
28   chlorinated solvent contamination that allegedly migrated onto or otherwise damaged property owned or possessed by
     Schlage and/or Touch-Plate.

1  depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence

2  of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving

3  party meets this initial burden, the burden then shifts to the non-moving party to present specific

4  facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324;

5  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The non-movant's

6  bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion

7  for summary judgment. *Anderson,* 477 U.S. at 247-48.  An issue of fact is material if, under the

8  substantive law of the case, resolution of the factual dispute might affect the case's outcome.  *Id.* at

9  248.  Factual disputes are genuine if they "properly can be resolved in favor of either party." *Id.* at

10  250.  Thus, a genuine issue for trial exists if the non-movant presents evidence from which a

11  reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the

12  material issue in its favor.  *Id.*  However, "[i]f the [non-movant's] evidence is merely colorable, or is

13  not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations

14  omitted).

**ANALYSIS**

15

16  **I.     Defendants' Motion for Summary Judgment of Plaintiff's Claims**

17          **A.      Defendants I-R New Jersey and I-R Bermuda**

18

19          Defendants claim that neither I-R New Jersey or I-R Bermuda are proper parties to this

20  litigation.  In particular, Defendants argue that neither entity was an owner or operator as defined by

CERLA, there is no evidence that either entity any property at or near the Bayshore Railyard, or

21  were otherwise involved with the subject matter of the Complaint.  Plaintiffs counter that I-R

22  Bermuda and I-R New Jersey are operators under CERLA because they are involved in remediating

23  the Schlage Lock property.  Moreover, Plaintiffs urge this Court to pierce the corporate veil and find

24  I-R Bermuda, as I-R New Jersey's parent, and I-R New Jersey, the parent of Touch-Plate and

25  Schlage, liable under CERLA and California tort law.

26          *1.      CERLA "Operator" Liability*

27          CERLA liability attaches to an "operator" of a contaminating facility.  42 U.S.C. §

28  9607(a)(2).  An operator is defined as one who is "operating such a facility."  42 U.S.C. §

9601(20)(A).  "An operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste.  *United States v. Bestfoods*, 524 U.S. 51, 62 (1998).  In *Kaiser Alum. & Chem. Corp*. v. *Catellus Dev. Corp*., 976 F. 2d 1338, 1341(1992), the Ninth Circuit reiterated the "well-settled rule that 'operator' liability under section 9607(a)(2) only attaches if the defendant had authority to control the cause of the contamination at the time the hazardous substances were released into the environment."

Here, I-R Bermuda did not exist until August 1, 2001, well after Schlage ceased its Plant 3 degreasing operations in 1977, and accordingly cannot be liable as an operator under CERLA. Further, I-R New Jersey's Vice President and Secretary, Barbara Santoro, testified in a declaration that I-R New Jersey has never owned or operated any property in the vicinity of the Bayshore Railyard.  Moreover, Plaintiffs have provided no authority suggesting that I-R New Jersey can be liable as an operator under CERCLA simply because it is ostensibly directing remediation efforts at the Schlage property.

### 2.    *Alter Ego Liability*

Plaintiffs also contend that I-R New Jersey and I-R Bermuda are liable under both CERLA[3] and California tort law under an alter ego theory. Generally, a parent corporation is not liable for the acts of its subsidiaries.  *Bestfoods*, 524 U.S. at 61.  There is a general presumption in favor of respecting the corporate entity.  *Calvert v. Huckins*, 875 F. Supp. 674, 678 (1995).  However, under the alter ego doctrine, "when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation . . ."  *Sonora Diamond Corp.,* 83 Cal. App. 4th at 538; *see Bestfoods*, 524 U.S. at 61 (corporate veil may be pierced when the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud). A prima facie case for piercing the corporate veil exits where: (1) there is such a unity of interest and ownership between the two entities that their separate personalities no longer exist; and (2) the failure to disregard each entity's separate identity would result in fraud and injustice. *American Telephone and Telegraph Co. v. Compagnie Bruxelles*

---

[3]Alter ego liability applies to CERLA actions.  *See Bestfoods,* 524 U.S. 51, 62-63.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

*Maber*, 94 F. 3d 586, 591 (9th Cir. 1996); *see also Baise v. Eastridge Companies*, 142 Cal. App. 4th 293, 301 (2006).  California law identifies a non-exclusive list of factors a court can examine in determining whether to apply the doctrine.  *Sonora Diamond Corp.,* 83 Cal. App. 4th at 538.  These factors include the failure to adhere to corporate formalities, undercapitalization, the failure to maintain minutes or adequate corporate records, identical directors and officers, overlap among employees, and the commingling of funds.  *Id.*

Having considered Defendants' evidence and arguments, the Court concludes that I-R Bermuda and I-R New Jersey have failed to meet their summary judgment burden of making a prima facie showing no triable issue exists as to whether they are liable for their subsidiaries activities under an alter ego theory.  *See RHL Industries, Inc. v. SBC Communications, Inc.*, 113 Cal. App. 4th 1277, 1287 (2006).  When asked at the hearing to specify what evidence establishes that I-R New Jersey and I-R Bermuda are separate entities from their respective subsidiaries, counsel again pointed to Ms. Santoro's testimony that neither I-R New Jersey or I-R Bermuda owned or operated property in the vicinity of the Bayshore Railyard.  This, however, says nothing about the relationship between the various defendant entities, and lacks any value in showing no triable issues of fact exist.

Nevertheless, even if I-R Bermuda and its subsidiary I-R New Jersey are alter egos, the Court fails to see how I-R Bermuda can be liable for the acts complained of since it was not created until 2001 - after the contaminating activities at the Schlage property ceased.   As such, the Court **GRANTS** I-R Bermuda's Motion for Summary Judgment as to all claims.

**B.      Plaintiffs' Claim for Contribution, CERCLA § 107**

*1.  Claim for Total Cost Recovery*

Defendants first contend that, to the extent Plaintiffs assert a claim for total cost recovery pursuant to § 107 of CERCLA, Plaintiffs are precluded from bringing such a claim because they are a potentially responsible party ("PRP").  This argument can be swiftly dealt with as the Court has already resolved this issue in favor of Defendants.  In its Order re Motion to Dismiss, the Court held: "to the extent that Plaintiffs seek to recover the totality of their clean-up costs against Defendants pursuant to § 107, the Court **GRANTS** Defendants' Motion to dismiss such claim."  (Doc. No. 37 at 7:9-11.)  Accordingly, the Court need not address this claim at the summary judgment stage.

9

United States District Court

For the Northern District of California

### 2. Claim for Equitable Contribution

Defendants next contend that under *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157 (2004) and *The Pinal Creek Group v. Newmont Mining Corp.*, 118 F. 3d 1298 (9th Cir. 1997), Plaintiffs do not have an implied right of contribution against Defendants since they cannot meet the requirements of § 113.  Plaintiffs respond that Defendant have twice made, and this Court has rejected these arguments in both its November 22, 2005 Order re Motion to Dismiss (Doc. No. 37), and April 24, 2006 Order Denying Motion for Certification for Immediate Appeal of Court's November 22, 2005 Order.  (Doc. No. 65.)

Plaintiff is correct.  This Court has previously considered Defendants' arguments, and analyzed the Supreme Court's *Cooper* decision, the Ninth Circuit's *Pinal Creek* decision.  The Court also analyzed California district court cases addressing this issue.  *See Adobe Lumber, Inc. v. Taecker*, 2005 WL 1367065, at *1-2 (E.D. Cal. May 24, 2005), *Kotrous v. Goss-Jewett Co.*, 2005 WL 1417152, at *3-4 (E.D. Cal. June 6, 2005), *Ferguson v. Arcata Redwood Co.*, 2005 WL 1869445, at *6 (N.D. Cal. Aug. 5, 2005), and *Aggio v. Aggio*, 2005 WL 2277037, at *4-6 (N.D. Cal. Sept. 19, 2005).  The Court found that the reasoning behind these district court decisions, which held that a claim for contribution may be brought under § 107 irrespective of the requirements of § 113, sound.

In addition, Second Circuit agrees that a PRP can bring claim for contribution under § 107(a), even if the PRP cannot meet the requirements of § 113(f)(1).  In *Schafer v. Town of Victor*, 457 F. 3d 188, 199 (2nd Cir. 2006), the court addressed the "threshold issue . . . [of] whether a potentially responsible party that may not seek contribution under § 113(f)(1) may nevertheless recover in indemnity under another section of CERCLA -- § 107(a) . . . ."  Noting that the Supreme Court had clarified that a potentially responsible party may seek contribution under § 113(f)(1) only if the party has already been sued under CERCLA, the court nonetheless held that such a PRP could still recover under § 107(a) for voluntarily incurred clean-up costs.  *Id.*

The Eighth Circuit is also satisfied that parties precluded from proceeding under § 113 may assert a claim for contribution under § 107.  *Atlantic Resarch Corp. v. United States*, 459 F. 3d 827, 835-837 (2006), *cert. granted*, *U.S. v. Atlantic Research Corp.*, 2007 WL 124673 (U.S. Jan. 19,

2007) (No. 06-562).  There, the U.S. argued that allowing Atlantic a § 107 remedy would render §

113 meaningless.  The court reasoned, however, that:

> liable parties which have been subject to §§ 106 or 107 enforcement
> actions are still required to use § 113, thereby ensuring its continued
> vitality. But parties such as Atlantic, which have not faced a CERCLA
> action, and are thereby barred from § 113, retain their access to § 107.
> This resolution gives life to each of CERCLA's sections, and is
> consistent with CERCLA's goal of encouraging prompt and voluntary
> cleanup of contaminated sites.

*Id.* at 837 (citing *Key Trectronics Corp. v. United States*, 511 U.S. 809, 818, and 819 n.13 (1994);

*United Technology v. Browning-Ferris Indus.*, 33 F. 3d 96, 99 n.8 (1994); *Pinal Creek*, 118 F.3d at

1301).

Defendants urge the Court to reevaluate its opinion because the Central District of California

has concluded that a PRP cannot bring a claim for contribution under § 107 without meeting the

requirements of § 113 in *City of Rialto v. U.S. Department of Defense*, 2005 U.S. Dist. LEXIS 25179

(C.D. Cal. Sept. 23, 2005), and *AMCAL Multihousing, Inc. v. Pacific Clay Products*, 2006 U.S. Dist.

LEXIS 79127 (C.D. Cal. 2006).  In addition, on remand from the Supreme Court, the *Cooper*

*Industries* district court held that § 107 does not confer the right to bring a cause of action for

implied indemnity, *Aviall Services, Inc. v. Cooper Industries, LLC*, 2006 U.S. Dist. LEXIS 55040 at

*36 (N.D. Tex. 2006), and the Third Circuit has rejected an implied right to contribution.  *E.I.*

*Dupont De Nemours & Co. v. United States*, 460 F. 3d 515 (3rd Cir. 2006).[4]

While the Court acknowledges the growing discord among the U.S. courts on this issue, it

remains of the opinion that Plaintiffs have a viable contribution claim under § 107(a) and declines to

deviate from the holdings in its previous orders.  Accordingly, the Court finds Plaintiffs may seek

equitable contribution against Defendants pursuant to § 107 and **DENIES** Defendants' Motion as to

this claim.

### C.        Plaintiffs' State Law Claims, Statute of Limitations

> *1. Negligence, Negligence Per Se, Indemnity, Strict Liability, and  Declaratory*
> *Relief.*

---

[4]Defendants also correctly point out that  *Consolidated Edison Co. v. UGI Utilities, Inc.*, 423 F. 3d 90 (2nd Cir. 2005), cited by Plaintiffs, holds that a PRP can obtain total cost recovery under § 107, a proposition which is contrary to Ninth Circuit law as articulated in *Pinal Creek*.

11

Defendant argues that the three-year statutes of limitations in California Code of Civil Procedure § 338(b) bars Plaintiffs' claims for negligence, negligence per se, indemnity, strict liability, and declaratory relief because Plaintiffs, as early December 28, 1989, should have known that their injury was caused by another's wrongdoing.  Specifically, Defendants contend that the sale contract stated that the Bayshore Railyard would need environmental remedial work, Plaintiffs had access to SPR's environmental reports, and environmental professionals repeatedly advised Plaintiffs to test for off-site sources of the contamination.[5]

Plaintiffs respond that Defendants' evidence does not show that Plaintiffs had actual or constructive knowledge that Defendants caused the contamination until after a November 1993 investigation by EMCON detected elevated concentrations of TCE and PCE in a leaking sump in Plant 3 on the I-R property.[6]  Defendants counter that Plaintiffs did not have to know or suspect the identity of the alleged wrongdoer; rather the suspicion of wrongdoing by some third party was enough to start the statute of limitations running.

Ordinarily, the statute of limitation on a claim begins to run from the accrual of the cause of action or, put another way, "upon the occurrence of the last element essential to the cause of action." *CAMSI IV v. Hunter Technology Corp.*, 230 Cal. App. 3d 1525, 1534 (1991).  Under the discovery rule, a cause of action accrues when the plaintiff actually discovers its injury and the negligent cause, or could have discovered the injury and cause through a reasonably diligent investigation.  *Id.* at 1536.  As stated by the California Supreme Court:

> Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her. . . . [T]he

[5]Defendants claim that, as to Schlage and I-R New Jersey, the limitations period ran from December 1989 to March 8, 1994, and then at least from July 1, 2001 to July 28, 2005.  As to Touch-Plate, Defendants contend that the limitations period ran from December 1989 to December 26, 1996, and then at least from July 1, 2001 to July 25, 2005.

[6]Defendants contend that assuming, *arguendo*, that the limitations period started running on Plaintiffs' claims in November 1993, the 1994 tolling agreement could only extend the statute of limitations until November 2000.  Since Touch-Plate and I-R New Jersey were not parties to the 1994 tolling agreement, the time to commence an action against them expired in November 1996.  Here, it is undisputed that Plaintiffs did not file their first action against Schlage, Touch-Plate, and Ingersoll-Rand Co. until December 27, 1996.  Although it may be true that Plaintiffs learned Defendants were responsible for the contamination via EMCON's November 1993 investigation and report, which appears to have been prepared for Pacific Lithograph Co., the record is silent as to whether Plaintiffs actually received this report in November 1993.  Since the Court cannot determine when Plaintiffs obtained the EMCON report, it cannot determine precisely when the statute of limitations began to run.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1

> limitations period begins once the plaintiff has notice or information of circumstances to put a reasonable person on inquiry.  A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her.

2

3

4

5

6 *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110-1111 (1988) (internal citations and quotes omitted).

7 In general, ignorance of the identity of the defendant does not affect the statute of limitations.  *Id.* at

8 1114.  The *Jolly* court, however, recognized that where the plaintiff conducts a prompt investigation

9 and brought suit after the results of the investigation were known, but after the limitations period had

10 expired, the cause of action might still be timely.  *Id.* at 1114 n.11 (citing *Whitfield v. Roth,* 10 Cal.

11 3d 874, 887-889 (1974)).

12        In *Witfield*, the plaintiff appealed from a judgment of nonsuit based on the failure to timely

13 submit a claim pursuant to the California Tort Claims Act.  On October 4, 1963 a county doctor

14 diagnosed and recommended tests for a possible craniopharyngioma, but the tests were not

15 performed and these events were not disclosed to the plaintiff's mother.  *Id.* at 879.  On July 3, 1964

16 plaintiff was formally diagnosed with a craniopharyngioma.  *Id.* at 881.  A medical records review

17 on October 19, 1965 revealed the possibility of wrongdoing by the county doctors, and plaintiff

18 submitted a tort claim to the county on November 19, 1965.  *Id.*  The court concluded that plaintiff

19 was diligent in pursuing her suspicion of possible negligence on the part of the various doctors and

20 hospitals, including the county and county doctor.  *Id.* at 889.  In particular, plaintiff's mother

21 contacted attorneys and wrote a letter to a newspaper within three months of the final diagnosis.

22 Also, there was no evidence that the lawyer was not reasonably diligent in pursuing discovery or that

23 the medical records examination.  As such, the cause of action accrued when the county's

24 wrongdoing was discovered on October 19, 1965 and the tort claim was timely.  *Id.*

25        Here, Defendants first contend that Plaintiffs were on notice of third party wrongdoing

26 because when Tuntex bought the Bayshore Railyard  in 1989, the sale contract specified the property

27 would need remedial environmental work.  This contract, however, specifies that the property would

28 be subject to future environmental remedial work because "[t]he Property is and has been used as a

13

United States District Court

For the Northern District of California

1   solid waste landfill site."  Thus, the Court fails to see how the contract placed Plaintiffs on notice

2   that third parties such as Defendants could be responsible for the contamination.

3          Defendants next claim that Plaintiffs were on notice of third party contamination because

4   Plaintiff had full access to the seller SPR's environmental reports.  While these reports confirm that

5   the north area of the Bayshore Railyard was contaminated, there is also evidence that the DTSC

6   opined that the probable cause of the contamination was oil-water separators formerly operated by

7   SPR, and that this area contained sludge traps that were operated by SPR.  Accordingly, there is a

8   genuine dispute as to whether these reports put Plaintiffs on notice that a third party adjacent

9   property owner was potentially responsible for the contamination.

10          To establish notice, Defendants also point to AGS' 1989 report stating that the location and

11   shape of the contaminant plume suggested an off-site source, Mr. Rios' suspicion that the

12   contamination had migrated from Defendants' property, and 1991 letters  from Levine-Fricke and

13   Bechtel to Plaintiffs stating they suspected an off-site source and advising Plaintiffs to conduct

14   certain tests.  Plaintiffs argue that this evidence does not show that they should have known that

15   Defendants were the source of the contamination.  But Plaintiff's need not have known that

16   *Defendants* were responsible.  *Jolly*, Cal. 3d at 1110.  Here, Defendants have provided evidence

17   establishing a suspicion of wrongdoing that obligated Plaintiffs to investigate further to ascertain

18   whether defendants were potentially culpable.  *Id.* at 1111.

19          Defendants claim that Plaintiff failed to investigate since they did not conduct the

20   recommended soil-gas survey.  Mr. Rios, however, testified that, in response to their suspicions,

21   Plaintiffs asked the DTSC to investigate whether an off-site source created the contamination.  The

22   DTSC did so and on April 6, 1992, concluded that there was no correlation between Defendants'

23   chemical use and disposal practices and the groundwater contamination pattern at the Bayshore

24   Railyard.  Plaintiffs also point out that there is no evidence that the recommended tests would have

25   determined an off-site source, and have offered evidence suggesting that EMCON had to visually

26   inspect and test a sump on Defendants' property to locate the VOC hotspot.

27          In sum, the Court concludes that there is a genuine issue of material fact as to when the

28   statute of limitations began running on Plaintiff's claims.

United States District Court

For the Northern District of California

*a. The Tolling Agreement*

Defendants next proffer that, to the extent that the statute of limitations did not previously expire, after the tolling period lapsed on July 1, 2001 as specified in the parties' Tolling Agreement, the applicable limitations period began running because there was no written agreement by the parties to further extend the tolling period.  Since Plaintiffs waited more than four years thereafter to file their claims, they are time barred.  Defendants also argue that verbal representations and Defendants' conduct cannot extend the tolling period in light of the Tolling Agreement's express directive that all modification needed to be in a writing signed by the parties. Plaintiffs counter that Defendants have not offered evidence showing that equitable estoppel do not apply, and in turn offer evidence that it does.  Particularly, Plaintiffs point to Defendants' actions, and defense counsel's representations that the limitations period would remain tolled notwithstanding the date specified in the Tolling Agreement.

California courts have recognized that, "[a] defendant will be estopped to invoke the statute of limitations where there has been 'some conduct by the defendant, relied on by the plaintiff, which induces the belated filing of the action.'" *Shaffer v. Debbas*, 21 Cal. Rptr. 2d 110, 115  (1993); *see also Doheny Park Terrce Homeowners' Ass'n, Inc.*, 34 Cal. Rptr. 3d 157, 165-66 (2005). Ordinarily, "whether estoppel exists - whether the acts, representations or conduct lulled a party into a sense of security preventing him from instituting proceedings before the running of the statute, and whether the party relied thereon to his prejudice - is a question of fact and not of law." *Id.*

In their opening brief, Defendants anticipate Plaintiffs' estoppel argument, but respond only by saying that estoppel does not apply because it is undisputed that the Tolling Agreement required modifications to be in writing, and that there was no such modification.  This Court has already rejected this argument.  (Doc. No. 37 n.4.)   By contrast, Plaintiffs provided evidence that from 1999 to 2005, the parties continued to work together to obtain regulatory approval for a joint RA and RI, and a joint Groundwater RAP as contemplated by the Tolling Agreement.  During this time, Defendants' counsel assured Plaintiffs' counsel that there was no reason to commence litigation in light of regulatory delays.  Also throughout this time, the parties continued to deposit funds into the

15

United States District Court

For the Northern District of California

1   reimbursement account created pursuant to the Tolling Agreement.  Further, Plaintiffs waited in

2   2004 to begin the mediation proceedings called for by the Tolling Agreement to allow Defendants

3   time to negotiate with a potential buyer of their property.  These facts permit an inference that all

4   parties continued to act in furtherance of and in the spirit of the Tolling Agreement because they

5   considered it to be still in effect notwithstanding the expiration of the tolling period.

6          In this vein, Plaintiffs also point to a March 21, 2002 email from defense counsel confirming

7   that the Tolling Agreement was still in effect and that the parties had been operating under that

8   assumption.  Defendants assert that Plaintiff's reliance on this email neglects the fact that defense

9   counsel noted therein that a formal amendment to the tolling agreement was required.  Defense

10  counsel, however, states only that a formal amendment would "probably [be] a good idea."  Far from

11  eradicating all dispute, this statement too permits a reasonable inference that the parties were

12  operating on the informal understanding that the statute of limitations was still tolled.

13         More persuasively, Defendants argue that, as matter of law, estoppel cannot apply here since

14  Plaintiffs were represented by counsel.  In *Romerro v. County of Santa Clara*, 3 Cal. App. 3d 700

15  (1970), the court held that the plaintiffs' reliance on statements by a superior court clerk that she had

16  one year to file a lawsuit after the county rejected her tort claim did not establish estoppel since

17  plaintiff was represented.  *Id.* at 704-705.  "Where one has been represented by an attorney in

18  connection with a claim the necessary elements for estoppel are not established as a matter of law."

19  *Id.* at 705 (citing *Tubbs v. Southern Ca. Rapid Transit Dist.*).  In *Tubbs*, 67 Cal. 2d 671 (1967),

20  plaintiff alleged that defendant, in accepting information, acting as though it were evaluating her tort

21  claim, and failing to tell her the claim had been denied by operation of law, was estopped from

22  asserting the statute of limitation as a bar when she missed the deadline to file a court action.  *Id.* at

23  678.  In rejecting plaintiffs argument, the court relied on two facts: plaintiff  was represented by

24  counsel who were charged with knowledge of the statute of limitations, and she failed to allege any

25  misrepresentations or promises to support her claim that she was induced to delay the filing of her

26  complaint in reliance thereon.  *Id.* at 679.  As such, representation by counsel was not determinative.

27  Similarly, in *Kunstman v. Mirizzi*, 234 Cal. App. 2d 753 (1965), the court rejected an estoppel

28  argument where an insurance adjuster told the plaintiff's attorney that liability was clear and the

**United States District Court**
For the Northern District of California

1   insurer intended to pay.  During the time it took plaintiff to obtain a medical report to support her

2   damages, the personal injury statute of limitations lapsed.  While the court certainly noted that

3   estoppel is not favored when a plaintiff is represented, it also based its decision on the plaintiff's

4   failure to identify any misrepresentations or promises she relied on in refraining from filing suit.  *Id.*

5   at 757-758

6          The Court finds these cases distinguishable from the present matter.  First, none involved a

7   prior agreement to toll the statute of limitations.  Second, the present matter does not involve

8   counsel's ignorance about, or neglect of a statute of limitations.  To the contrary, *because of* the

9   statute of limitations, the parties negotiated a tolling agreement and the issue here is whether

10  Defendants' and defense counsel's statements and conduct essentially extended the tolling period

11  beyond the date specified.  Third, defense counsel expressly agreed that the Tolling Agreement was

12  still in effect despite the fact that the tolling period had expired.  If Defendants, in truth, did not so

13  agree, then counsel's statement could be deemed a misrepresentation - the  element the courts in

14  *Tubbs* and *Kunstman* found lacking.   That Plaintiffs here were represented by attorneys is but one

15  factor in the equation.  Viewing the evidence in the light most favorable to Plaintiffs, as the Court

16  must do at the summary judgment stage, the Court concludes that Plaintiffs' evidence is sufficient to

17  create a question of fact for the jury.

18         In light of all of the above, the Court **DENIES** Defendants' Motion on Plaintiffs'

19  Negligence, Negligence Per Se, Indemnity, Strict Liability, and  Declaratory Relief claims.

20                *2.     Breach of Contract Claim*

21         In their Complaint, Plaintiffs allege that Schlage and SPR entered into a commercial lease

22  whereby Schlage leased a portion of SPR's property for its use.  Plaintiffs further allege that they

23  assumed  all rights and liabilities with respect to the lease when they bought the property from SPR,

24  and that Schlage breached the lease by allowing the property to become contaminated.  (Complaint ¶

25  ¶ 150-153.)   Defendants claim that Plaintiff's breach of contract claim is barred by the four year

26  statute of limitations.  Code. Civ. P. § 337(1).

27         Defendants assert again that Plaintiffs had constructive notice of claims beginning in 1989

28  when they purchased the property with knowledge of contamination.  They also argue, in the

1   alternate, the tolling period in the Tolling Agreement expired on July 1, 2001.  As such, the statute

2   of limitations on Plaintiffs' breach of contract claim lapsed on July 1, 2005.  As discussed above,

3   there is a genuine issue of material fact as to when Plaintiffs claims accrued and whether or

4   equitable estoppel applies to extend the limitations period.

5          Thus, the Court **DENIES** Defendants' Motion as to Plaintiffs' Breach of Contract claim.

6

7   **II.    I-R New Jersey and Schlage's  Motion for Summary Judgment of Their Counter-Claim**
         **Under the HSSA against Plaintiffs, and Union Pacific's Cross-Motion for Summary**
         **Judgment on Defendants' HSAA and CERCLA Claims.**

8

9          I-R New Jersey and Schlage assert a counterclaim against Plaintiffs and Union Pacific

10  pursuant to the HSAA.[7]  In short, Defendants contend that Plaintiffs are liable as the present

11  owner/operator of a property where hazardous substances are deposited, and Union Pacific is liable

12  as the past owner/operator of such a property.[8]  Plaintiffs counter that Defendants evidence does not

13  demonstrate the absence of a triable issue of fact as to whether Plaintiffs were responsible for any

14  contamination, and that Defendants have not proffered evidence that they have incurred remediation

15  or removal costs as a result of conduct by Plaintiffs or Union Pacific.

16         Union Pacific opposes Defendants' Motion and moves for summary judgment on

17  Defendants' HSAA and CERCLA claims on the grounds that it cannot be liable under the HSAA or

18  CERCLA for releases of hazardous substances which occurred on the Schlage property or that

19  passively migrated in groundwater from Schlage to the Bayshore Railyard before SPR sold the

20  property to Plaintiffs.  In addition, Union Pacific claims that, even if it is a responsible party, it is

21  entitled to the third-party defense set forth in CERLA section 107(b).  42 U.S.C. § 9607(b)(3).

22         Under the HSAA, any person who has incurred removal or remediation actions costs in

23  accordance with the Act or CERCLA may seek contribution from any potentially responsible party.

24  Health & Saf. Code § 25363(e).  Responsible parties or liable persons under the HSAA are those

25  persons described in CERCLA § 107(a).  Health & Saf. Code § 25323(a)(1).  Thus, responsible

26  _____

27         [7]For the sake of simplicity, the Court's reference to "Defendants" in this portion of its order shall refer to I-R New Jersey and Schlage.

28         [8]Defendants seek only an adjudication as to liability, not the apportionment of damages.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   parties under the HSAA include the present owner or operator of property where hazardous

2   substances are deposited, 42 U.S.C. § 9607(a)(1), and any person who at the time of disposal of any

3   hazardous substances owned or operated any facility at which such substances were deposited.  42

4   U.S.C. § 9607(a)(2).

5         Having considered the parties arguments and the evidence presented, the Court finds that

6   there are triable issues of fact as Defendants' HSAA and CERCLA claims and summary judgment in

7   favor of Defendants or Union Pacific is inappropriate.  In particular, the evidence before the Court

8   permits multiple inferences: that Defendants' operations were the exclusive cause of the

9   contamination; that SPR's prior railroad operations at the Bayshore Railyard were the exclusive

10  cause of the contamination; or that all parties are, in part, responsible for the contamination.  For

11  example, an April 15, 1993 Cleanup and Abatement Order states that during SPR's ownership,

12  activities associated with railcar maintenance and switching left the Bayshore Railyard

13  contaminated, and that the northern area was found to contain elevated levels of VOCs, but does not

14  expressly link the two findings.  AGS' report for Tuntex stated that the location and shape of the

15  contaminant plume in the northwest area of the Bayshore Railyard suggested an off-site source.  But

16  the DTSC stated that the sludge traps operated by SPR were a *probable* source of VOC

17  contamination in the north area, and Union Pacific's expert opined that VOCs in the groundwater in

18  the northern portion of the Bayshore Railway migrated from the Schlage property.  Then Treadwell

19  & Rollo later discovered that groundwater possibly flows from the Bayshore Railyard towards the

20  Schlage property.  A report by Harding Lawson Associates detected VOCs in a sump near the

21  northwest portion of the Bayshore Railyard that *may* have been associated with prior SPR operations

22  or activities.  Treadwell & Rollo concluded that SPR had used and released chlorinated solvents at a

23  number of locations on the Bayshore Railyard, including in connection with the oil/water separators

24  and sludge pits at the Northern end of the property, which Union Pacific disputes.  At various points

25  in time the DTSC has deemed SPR, Tuntex, Schlage, and I-R New Jersey as responsible parties.

26        Defendants contend that it is irrelevant whether Plaintiffs or SPR released the exact

27  hazardous materials Defendants ultimately incurred costs to clean up.  Rather, Defendants contend

28  that they need only show that Plaintiffs and SPR owned or operated the Bayshore Railway at a time

when there was a release of a hazardous substance of *any* kind, and that Defendants have incurred costs for cleaning up any contamination there.  But *Axel Johnson, Inc. v. Carroll Carolina Oil Co.*, 191 F. 3d 409, (4th Cir. 1999), cited by defendants in support of this proposition, involved multiple owners of the same property.  Under those circumstances, the court merely noted that the release of a hazardous substance during a particular owner's tenure subjected that owner to liability regardless of whether that owner actually deposited the substance that was released.  *Id.* at 414.  The court confirmed that liability exists if there is a release of hazardous substances from the facility and *that release* results in the incurrence of response costs.  *Id.*  The Ninth Circuit agrees. "CERCLA provides that a party that releases a hazardous substance is liable for another's response costs, but only if its release caused the other party to incur those response costs." *Boeing Co. v. Cascase Corp.*, 207 F. 3d 1177, 1182 (9th Cir. 2000.)  Accordingly, evidence that SPR may have released hazardous substances on other areas of the Bayshore Railway does not establish that Union Pacific and Plaintiffs are responsible for costs Defendants may have incurred in cleaning up the VOC contamination existing in the north area of the Bayshore Railway or in the leased parking lot. Indeed, with respect to Plaintiffs, Defendants have not submitted any evidence that Plaintiffs released any hazardous materials for which Defendants have incurred clean-up costs.  And it is doubtful that Defendants can recover costs incurred in cleaning up any hazardous materials deposited by SPR on the Bayshore Railyard that passively migrated to the Schlage Property during Plaintiff's ownership of the Bayshore Railyard.  *See Carson Harbor Village v. Unocal Corp.*, 270 F. 3d 863. 877-78 (9th Cir. 2001).

Union Pacific, in turn, argues that even if it is a responsible party, it is entitled to the third-party defense.  For the this defense to apply, a party must establish that: (1) a third party was the sole cause of the release of a hazardous substance; (2) the third party was not an employee or agent of the party asserting the defense; (3) the acts or omissions of the third party causing the release did not occur in connection with a contractual relationship existing either directly or indirectly which the party asserting the defense; (4) the party asserting the defense exercised due care with respect to the hazardous substances concerned; and (5) the party asserting the defense took precautions against foreseeable acts or  omissions of the third party.  *Lincoln Properties Ltd. v. Higgins*, 823 F. Supp.

**United States District Court**
For the Northern District of California

1528, 1539-1540 (E.D. Cal. 1992).  As discussed above, however, the Court cannot, based on the evidence presented, determine conclusively that Defendants were the sole cause of the contamination at the Bayshore Railroad.

In light of the above, the Court **DENIES** IR-New Jersey and Schlage's Motion for Summary Judgment on their HSAA claim and **DENIES** Union Pacific's Motion as to Schlage and I-R new Jersey's HSAA and CERCLA claims.

**III.  Union Pacific's Motion for Summary Judgment of Defendants' Remaining Claims**

　　　　**A.　　　Breach of Contract, Negligence, Nuisance, and Trespass Claims.**

Schlage alleges that Union Pacific breached the lease Schlage entered into with SPR, Union Pacific's predecessor, by allowing the leased property to become contaminated with hazardous substances.  Union Pacific, however, contends that Schlage's breach of contract claim is barred by the four year statute of limitations.  Cal. Code Civ. P. § 337.  The lease at issue commenced on January 1, 1981, for a term of ten years.  Thus, argues Union Pacific, assuming *arguendo* that SPR was Schlage's lessor and retained contractual obligations to Schlage for the entire term of the lease, any breach of contract claim would have accrued by January 1, 1991, and the statute of limitation would have run by January 1, 1995.  Since Schlage did not file its counter claim until December 12, 2005, its claim is barred.

Union Pacific also avers that Defendants' claims for negligence, nuisance and trespass are time barred by the three year statute of limitations.  Cal. Code Civ. P. § 338(b).  Specifically, Schlage was put on notice of groundwater contamination in the northern portion of the Bayshore Railyard when it was contacted by the DTSC in June 1991.  Union Pacific also contends that Defendants were further put on notice of potential claims against SPR when the DTSC issued an ISEO to Schlage in September 1994, and later amended the ISEO to add SPR as a responsible party in June 1995.  Lastly, Union Pacific proffers that by October 1995, Teadwell & Rollo had completed an interim remedial investigation for Schlage which included research regarding and a site assessment of the Bayshore Railway.  As such, Defendant claims accrued no later than October

United States District Court

For the Northern District of California

1   1995, and lapsed long before it filed suit on December 12, 2005.[9]

2       Defendants admit that their common law claims arise only from chlorinated solvent

3   contamination found in the leased parking lot, and any such contamination that migrated from the

4   Bayshore Railway to the Schlage property.  Relying on the discovery rule, Defendants argue that

5   they had no reason to suspect that contamination in the parking lot was caused by external sources

6   until at least 2003.  In particular, Defendants contend that their claims did not accrue until

7   investigations revealed that the groundwater beneath a portion of Bayshore Railyard flowed to the

8   north near the Schlage property.  According to Defendants, that the DTSC contacted them earlier

9   about potential contamination in the north area of the Bayshore Railway is irrelevant.

10      As discussed in above, the discovery rule obligates a party to conduct an investigation once it

11  suspects that an injury was caused by a third party's wrongdoing.  *Jolly*, 44 Cal. 3d at 1111.  Here,

12  the Court finds that there are triable issues of material fact as to when Defendants' common law

13  causes of action accrued against Union Pacific.

14      Plaintiff insists that the DTSC's contact with Defendants in 1991, and  DTSC's 1995

15  amendment to its Remedial Action Order to include SPR as a responsible party put Defendants on

16  notice of its injury and Union Pacific's potential liability.  But the DTSC's actions did not concern

17  contamination in the parking lot.  Moreover, Defendants have offered evidence suggesting that the

18  bulk of information available to them indicated that contamination was migrating from Schlage to

19  the Bayshore Railyard, and not *vice versa*.  In particular, prior to 2002, testing and investigation

20  revealed that ground water flowed such that chlorinated solvents released by Schlage would travel

21  towards the Bayshore Railyard.  During this time the parties were focused on the sources of

22  contamination in the Bayshore Railyard, including the possibility that contamination had migrated

23  there from the Schlage property.  In 2001, the parties environmental consultants began conducting

24  certain tests, and late-2002 results suggested for the first time that groundwater from beneath the

25

26      [9] Union Pacific also asserts that any claims by Defendants' for continuing nuisance or continuing trespass are limited
    to seeking damages incurred since December 12, 2002, three years before it filed suit.  *Federal Deposit Insurance Corp. v.*

27  *Jackson Shaw Partners No. 46 Ltd.*, 850 F. Supp. 839 (N.D. Cal. 1994.) (for a continuing nuisance or trespass, injured party
    may seek damages only for temporary injury suffered up to three years prior to commencement of the action); *see also*

28  *Mangini v. Aerojet-General Corp.*, 230 Cal.App.3d 1125, 1148 (1991).  Defendants do not address this argument.
    Accordingly, the Court finds that to the extent that Defendants seek damages for a continuing trespass or continuing nuisance,
    their damages are limited to those incurred since December 12, 2002.

1   northern portions of the Bayshore Railyard flowed in the direction of the Schlage property due to the

2   influence of the Sunnydale sewer line.  Accordingly, throughout 2003, Defendants environmental

3   consultants Treadwell & Rollo investigated the possibility that chlorinated solvent contamination on

4   the Schlage property was coming north from the Bayshore Railyard.  This evidence supports

5   Defendants' contention that its cause of action did not accrue until 2003.

6          Union Pacific counters that even if the discovery rule applies, there is evidence that

7   Defendants should have known that groundwater flowed from the Bayshore Railway towards the

8   Schlage property as early as November 2000.  Specifically, Plaintiff points to a November 2000

9   letter co-signed by Treadwell & Rollo stating tests revealed that in the absence of pumping by the

10  Groundwater Extraction and Treatment System, the Sunnydale sewer is downgradient of both the

11  Schlage and Railyard properties, and a November 2000 meeting wherein defense counsel informed

12  DTSC that pump shutdown tests had shown that groundwater from both the Schlage and Bayshore

13  Railyard properties flowed into a trough created by the sewer.  Even so, these competing factual

14  contentions highlight that there is a genuine issue of material fact for trial.

15         Accordingly the Court **DENIES** Union Pacific's Motion as to Defendants' Breach of

16  Contract, Negligence, Nuisance, and Trespass Claims.

17              **B.      Claims for Equitable and Implied Indemnity and Contribution**

18         Citing to *Smith v. Parks Manor*, 197 Cal. App. 3d 87, 88 (1987), Union Pacific asserts that a

19  one year statute of limitations governs claims for equitable indemnity and, thus, Defendants' claims

20  for equitable and implied indemnity, and contribution are limited to costs paid since December 12,

21  2004.  Citing *City of San Diego v. U.S. Gypsum Co.*, 30 Cal. App. 4th 575 (1994), Defendants

22  contend that the three year statute of limitations in Code of Civil Procedure § 338(b) for injuries to

23  real property apply to its indemnity claims.

24         A cause of action for indemnity accrues, however,  when the indemnitee suffers a loss

25  through payment of a judgment or settlement debt.  *Parks Manor Manor*, 197 Cal. App. 3d  at 88.

26  "[The California] Supreme Court has consistently ruled that cause of action for indemnity does not

27  accrue until the indemnitee suffers loss through payment of an adverse judgment or settlement."

28  *City of San Diego*, 30 Cal. App. 4th at 588 (citing *Valley Circle Estates v. VTN Consolidated, Inc.*,

United States District Court

For the Northern District of California

1  33 Cal. 3d 604, 611 (1983); *People ex rel. Dept. of Transportation v. Superior Court,* 26 Cal. 3d

2  744, 748 (1980) (superceded on other grounds)).  Here, Defendants' cause of action has not yet

3  accrued since they have yet to be to pay any adverse judgment or settlement.

4      The Court also notes that, although Union Pacific moved for summary judgment on

5  Defendants' contribution claim on a statute of limitations theory, it does not discuss the applicable

6  statute of limitations.  In any event, a party acquires a right to contribution "as soon as he pays more

7  than his share, but not until then, and consequently the statute of limitations does not begin to run

8  until then." *Richter v. Blasingame*, 110 Cal. 530, 537 (1895) (internal quotations omitted); *see also*

9  *Fireman's Fund Ins. Co. v. Sparks Const., Inc.*, 114 Cal. App. 4th 1135, 1151 (2004) (contribution

10 causes of action do not accrue until joint tortfeasor pays injured party's claim).  Here again,

11 Defendants have not paid any settlement or judgment related to this case, and until each parties'

12 respective liability or lack thereof is determined, the Court cannot say that Defendants have paid

13 more than their fair share or remediation costs.  Accordingly, there is a triable issue of fact as to if

14 and when Defendants' claim for contribution has accrued.

15     Accordingly, the Court **DENIES** Union Pacific's Motion for Summary Judgment on

16 Defendants Equitable and Implied Indemnity, and Contribution claims.

### CONCLUSION

18     For the foregoing reasons, the Court **GRANTS** Summary Judgment in favor of I-R Bermuda

19 as to all claims.

20     The Court **DENIES** I-R New Jersey, Touch-Plate, and Schlage's Motion as to all claims.

21     The Court **DENIES** Union Pacific's Motion as to all claims.

22 **IT IS SO ORDERED.**

23

24 Dated: February 13, 2007

25

26

27

28     _____
       MARTIN J. JENKINS
       UNITED STATES DISTRICT JUDGE

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28